J-S06001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: P.B., A MINOR APPEAL OF L.B., MOTHER | : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | No. 2984 EDA 2018 |

Appeal from the Decree Entered September 17, 2018
In the Court of Common Pleas of Montgomery County Domestic Relations
at No(s): 2018-A0103

| IN RE: R.B., A MINOR APPEAL OF L.B., MOTHER | : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | No. 2987 EDA 2018 |

Appeal from the Decree Entered September 17, 2018
In the Court of Common Pleas of Montgomery County Domestic Relations
at No(s): 2018-A0102

| IN RE: S.B., A MINOR APPEAL OF L.B., MOTHER | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | No. 2989 EDA 2018 |

Appeal from the Decree Entered September 17, 2018
In the Court of Common Pleas of Montgomery County Domestic Relations
at No(s): 2018-A0101

BEFORE:  BOWES, J., DUBOW, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:                                    **FILED APRIL 17, 2019**

L.B. ("Mother") appeals from the orphans' court decrees entered on September 17, 2018, that granted the petitions of the Montgomery County Office of Children and Youth ("OCY") to involuntarily terminate her parental rights to her daughter, P.B. (born in December of 2010), and two of her sons, S.B. (born in December of 2007) and R.B. (born in October of 2016).[1]  After careful review, we affirm.

The family became involved with OCY in May of 2016 due to concerns regarding Mother's mental health, the family's housing, and S.B.'s truancy.[2] OCY Exhibit 9.  At that time, Mother, who was pregnant with R.B., resided with R.B.'s father, D.T., P.B., S.B., and Ry.B., a third son who is not involved in this appeal.[3]  N.T., 8/3/18, at 198.  Following OCY's intervention, the family moved between several motels and shelters, finally obtaining a suitable home in November 2016 with the assistance of OCY and the Your Way Home program.  *Id*. at 198-99, 204-06; N.T., 8/23/18, at 103-06.

---

[1] The orphans' court also involuntarily terminated the parental rights of the respective fathers of S.B. and R.B.  P.B.'s father, C.B., voluntarily relinquished his parental rights.  None of the fathers participated in this appeal.

[2] OCY received an initial referral in late 2015, but closed the referral following an investigation.  *See* OCY Exhibit 12.

[3] Ry.B., born in August of 2014, now resides with his birth father, D.E., and was not the subject of a petition to terminate Mother's parental rights.

In December of 2016, D.T. was arrested for allegedly threatening Mother with a gun, throwing a child he was babysitting, and attempting to strike S.B. with a curtain rod. N.T., 8/3/18, at 210. The criminal court issued a no-contact order prohibiting D.T. from contacting Mother, S.B., P.B., or Ry.B.[4] *Id*.

In May of 2017, S.B. ran away from home to his therapist's office. *Id*. at 213-14. S.B. refused to return to his home because D.T. resided there, and S.B. was afraid of him. *Id*. The Pottstown police responded. *Id*. at 214-15. Mother insisted D.T. did not reside in the home, but D.T. was there when the police arrived. *Id*. The Pottstown police obtained emergency custody of S.B., and OCY located a foster home for him. *Id*. The court conducted a shelter care hearing for S.B. on May 22, 2017. *Id*. at 315-16. Mother was directed to appear at the hearing with the other three children. *Id*. at 215. However, Mother, who was represented by counsel throughout the proceedings, neglected to present the children as ordered. N.T., 8/23/18, at 112. Prior to the hearing, Mother informed OCY that the children were nearby. N.T., 8/3/18, at 215. Upon questioning by the court, however, Mother reported that the other children were in Vermont.[5] *Id*. The court required Mother to remain in the courtroom for several hours until the children

---

[4] The court permitted supervised contact between D.T. and his child, R.B. N.T., 8/3/18, at 210.

[5] Mother subsequently testified that she mistakenly believed the children had already left for Vermont, but acknowledged they had not. N.T., 8/23/18, at 112-13.

eventually arrived, and then entered an order for emergency custody for P.B., Ry.B., and R.B. *Id*. at 215, 317-18.

S.B., P.B., and R.B. were subsequently adjudicated dependent on June 6, 2017. The three children have resided in the same pre-adoptive foster home since July 2017. *Id*. at 233-34, 238-41. As a consequence of Mother's misrepresentations to the court, the court's dispositional orders directed that, "there shall be no visitation until further order of court." Juvenile Dispositional Order, 6/20/17, at 1. Moreover, the court required Mother to obtain a psychological evaluation and a parenting capacity evaluation prior to resuming visitation with the children. N.T., 8/3/18, at 322-23. Mother did not appeal the dispositional orders, which were final. *See In re Tameka M.*, 534 A.2d 782, 784 (Pa.Super. 1987) ("An appeal cannot be taken from a dependency determination; instead, an aggrieved party must wait until an order of disposition is entered.").

OCY implemented a family service plan ("FSP"). The FSP required Mother to meet the family's basic financial needs for daily living, keep OCY advised of her contact information, obtain and maintain housing, address her mental health, and to the extent that visitation was reinstated, have pleasant visits. N.T., 8/3/18, at 223-24; OCY Exhibit 4, 5. During the next permanency review hearing, the juvenile court considered Mother's request to resume visitation with her children, but because Mother was disruptive, the ensuing juvenile court order did not reinstate visitation. N.T., 8/23/18, at 174; N.T., 8/3/18, at 224. Again, Mother neglected to challenge the appealable order.

*See In re C.B.*, 861 A.2d 287, 289 n.1 (Pa.Super. 2004) (juvenile court order suspending visitation was appealable).  Mother missed the next permanency review hearing due to a scheduling mistake.  She made no further entreaties to the juvenile court to reinstate visitation.  Ultimately, between May 2017, and August 2018, Mother had no contact with her children.  N.T., 8/3/18, at 224; N.T., 8/23/18, at 132-33.

Mother's efforts towards meeting her FSP goals were limited.  On June 4, 2018, OCY filed petitions to involuntarily terminate Mother's parental rights to S.B., P.B., and R.B.  The orphans' court conducted hearings on the petitions on August 1, 3, 20, and 23, 2018.  At the hearings, Susan Karnes Quirits, Esquire acted as legal counsel for S.B., P.B., and R.B.[6]  Sharon Lynn Jones-Hofer, Esquire, was appointed as their guardian *ad litem* ("GAL").  OCY presented several witnesses, including Stephen Miksic, Ph.D., who conducted a forensic psychological/parenting evaluation of Mother, and Kathleen Spano, a caseworker for OCY.  Mother testified on her own behalf.  On September 17,

---

[6] Prior to the start of the hearings, the orphans' court engaged in an extensive discussion with Attorney Quirits, confirming that Attorney Quirits met with S.B., P.B., and R.B., and attempted to discern their preferred outcomes.  N.T., 8/1/18, at 7-8.  S.B. expressed a desire for Mother's parental rights to be terminated, and did not want to see Mother again.  *Id*. at 7-9.  P.B. wanted to remain with her brothers in the current foster home, and did not want to live with Mother, although she expressed, at different times, a desire to see Mother.  *Id*. at 8-10.  Both S.B. and P.B. wanted to be in a permanent home. *Id*. at 19.  R.B., who was nearly two at the time, was too young to express a preferred outcome.  *Id*. at 8.  Based upon our review of the record, it is apparent that counsel appropriately determined and represented the legal interest of S.B., P.B., and R.B.

2018, the orphans' court entered decrees involuntarily terminating Mother's parental rights to S.B., P.B., and R.B.

Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[7]

She raises the following issues for our review:

1.    Whether the . . . [t]rial [c]ourt committed reversible error when it denied . . . Mother visitation of any kind for the entire period her three children were in physical custody of Children and Youth Services?

2.    Whether the [t]rial [c]ourt committed reversible error when it involuntarily terminated . . . Mother's parental rights when she was not provided adequate services for a sufficient period of time, including[,] but not limited to[,] reasonable visitation with her children?

3.    Whether the [t]rial [c]ourt committed reversible error by failing to discuss the nature and status of the parent-child bond and the effect on the bond resulting from the [c]ourt's prohibition of any contact and/or communication by . . . Mother with her children?

4.    Whether the [t]rial [c]ourt acted with manifest unreasonableness, partiality, prejudice, bias, or ill will in denying . . . Mother's visitation and/or access to her children the entire time they were in custody?

5.    Whether the [t]rial [c]ourt committed reversible error by failing to recognize and consider that the denial of visitation contributed to destroying [the] familial bond and deprived . . . Mother of a fundamentally fair procedure?

---

[7] This Court consolidated the appeals *sua sponte*.

Mother's brief at 4.

We review these claims mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

Instantly, the orphans' court terminated Mother's parental rights pursuant to § 2511(a)(2), (8), and (b). This Court may affirm the orphans'

court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a) as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). The record supports the orphans' court's analysis of § 2511(a)(2) and (b), which provide:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>     . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

Our Supreme Court set forth our inquiry under § 2511(a)(2) as follows:

> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa.Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id*. at 340.

In addressing § 2511(a), the orphans' court observed that OCY attempted to work with Mother to address her employment, housing, and mental health issues. Trial Court Opinion, 9/14/18, at 17. The court noted Mother did not provide a complete copy of her mental health evaluation to OCY for many months, and she did not participate in individual therapy as Dr. Miksic recommended. *Id*. It credited testimony demonstrating that Mother prioritized her relationship with D.T., and her perceived need for a partner, over her duty to keep the children safe and protect them from domestic violence. *Id*. at 18. The court observed that Mother made no progress towards achieving stable housing, or achieving a stable income, and she did not evidence a reasonable effort toward reunification. *Id*. at 19. It expressed

regret that Mother was not afforded visitation with her children, and noted "the possibility of visits should have received a more thoughtful consideration by OCY and the [c]ourt." *Id*. at 19-20. However, the court concluded that Mother "has failed so completely to make progress on any of the goals necessary for her to be reunified with her children that, at this late date, reintroducing visits would be fruitless and likely counterproductive for the children." *Id*. at 20. For the reasons discussed, *infra*, the orphans' court's rationale does not constitute an abuse of discretion.

While Mother raised five distinct issues in her brief, she blends those concepts into one frustratingly disjointed two-and-one-half-page argument. *See* Mother's brief at 8-10. She neglects to present any focused challenges to the orphans' court's determinations relating to the statutory grounds for the termination of parental rights pursuant to § 2511(a). Indeed, the lone reference to the controlling statute appears in the section of her brief dedicated to the statement of the case. Instead, Mother quotes from two non-agency-related termination cases that discussed the damaging effect of one party erecting barriers to prevent the parent whose rights are subject to termination from exercising parental rights, *see In Re E.MS.*, 633 A.2d 388 (Pa.Super. 1995), and *In re J.G.J.*, 532 A.2d 1218 (Pa.Super. 1987), and one case that reiterates the proposition that a child service agency such as OCY cannot refuse reasonable efforts to an incarcerated parent when a strong parent-child bond existed prior to incarceration. *See In Interest of H.K.*, 161 A.3d 331 (Pa.Super. 2017).

At the outset, we observe that Mother's invocation of *In Re E.MS.* and *In re J.G.J.* are wholly unpersuasive insofar as both of those cases relate to the statutory grounds for terminating parental rights pursuant to § 2511(a)(1), which is not implicated in this case.[8]  Similarly, to the extent that Mother is contending that the juvenile court committed reversible error in suspending her visitation, she has failed to preserve that claim.  The orders suspending Mother's visitation were entered by the juvenile court in the dependency cases, not by the orphans' court in the termination cases that are the geneses of these appeals.  As noted *supra*, juvenile court orders suspending a parent's visitation are appealable.  *See In re C.B.*, *supra* (concluding that order suspending father's visitation was final, appealable order pursuant to *In re H.S.W.C.-B.*, 836 A.2d 908, 911 (Pa. 2003)).  Hence, the relevant juvenile court orders were appealable when entered, and since Mother neglected to appeal those orders, she cannot collaterally attack the propriety of the juvenile court's decision herein.

Next, we observe that, although Mother does not specifically challenge the court's rationale relating to § 2511(a)(2), her reference to our decision in *In Interest of H.K.*, *supra*, is tangentially relevant to her underlying argument because, as in the instant case, the orphans' court terminated the parent's parental rights pursuant to the statutory grounds outlined in

---

[8] Section 2511(a)(1) provides: "The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."  23 Pa.C.S. § 2511(a)(1).

- 11 -

§ 2511(a)(2). Nevertheless, Mother's passing citation to *In Interest of H.K.* is patently inapposite insofar as Mother is not an incarcerated parent with a strong bond with her children. More importantly, the relevant legal principle in that case, which Mother attempts to apply to the dissimilar facts of the case at bar, stems from our High Court's contrary position in *In re D.C.D.*, 105 A.3d 662 (Pa. 2014). That decision, which we discuss thoroughly *infra*, provided that the "Superior Court erred in reversing the trial court's termination of Father's parental rights as a result of CYS's failure to provide reasonable efforts to enable Father to reunify with Child." *Id*. at 676. We apply the High Court's holding in *In re D.C.D.* to Mother's broad assertions.

The crux of Mother's argument is that the orders suspending visitation derailed her reunification efforts from the outset. Mother first highlights the portions of the orphans' court's rationale denoting some reflective regret that the suspension lingered throughout the entire dependency. Quoting the orphans' court, Mother writes,

> The [c]ourt's [o]pinion states "that [Mother] [h]as for so long been under a court order preventing her from visiting her children is regrettable, and in hindsight it seems that the possibility of visits should have received more thoughtful consideration by OCY and the [c]ourt. The interests of the children in having visits should have been considered in the first six months after they were placed in foster care."

Mother's brief at 8 (quoting Trial Court Opinion, 9/14/18, at 19-20).

Thereafter, Mother complains that OCY's justification for withholding its support for visitation due to Mother's lack of progress in achieving her FSP

- 12 -

goals was unfounded. Mother's brief at 8. For example, Mother notes that D.T., the abusive father of R.B., was permitted supervised visitation with R.B., and she contends that OCY advised her that, consistent with the juvenile court's directive, it would support her visitation following a psychological evaluation. Mother participated in the court-ordered evaluation with Dr. Miksic, who drafted a report dated September 19, 2017. However, Mother stresses that she previously obtained an independent evaluation from Northwestern Human Services in Lansdale, Pennsylvania, during July 2017. That sparse evaluation report, which Mother introduced during the termination hearing, indicated that Mother had been diagnosed with unspecified depressive disorder, prescribed medication, and instructed to participate in individual therapy. *See* Mother's Exhibit 1. However, since Mother neglected to transmit the entire evaluation to OCY until approximately eight months later, the agency did not pursue visitation on her behalf during that period. Mother asserts that she timely transmitted the complete evaluation but she provides no form of verification or explanation for why OCY did not receive it. Nevertheless, she assails OCY for failing to support her unspoken request for visitation in the interim. *Id*.

Blaming OCY, rather than the juvenile court for suspending reunification, Mother frames her argument as follows:

> [T]he denial of even supervised visitation for 15 months was unjustified by the circumstances of this case. [Mother]'s lack of progress is not a reason to deny visitation especially since it was present from the very outset of placement by the court. Had OCY permitted [Mother] visitation, her motivation to cooperate with

them and achieve goals may well have been enhanced. Refusal may well have . . . dampened any desire to cooperate and achieve.

The prohibition of visitation destined this matter to failure from its inception.

The denial of visitation in this case was an abuse of discretion and manifestly unreasonable and cries out for remedy.

Mother's brief at 9-10. For the following reasons, we disagree.

The certified record belies Mother's current argument that her dispiritedness affected her ability to make anything but minimal progress toward satisfying the FSP goals. Mother testified during the evidentiary hearing, and specifically blamed her poor progress on homelessness, unemployment, and her ensuing pregnancies. Tellingly, although Mother indicated that not seeing the children was difficult emotionally, she never claimed that the court-ordered suspension of visitation made her indifferent toward reunification. N.T., 8/23/18, at 127-28.

Furthermore, to the extent that Mother complains that OCY failed to make reasonable efforts to reunite her with her children, no relief is due. As noted, *supra*, Mother's reference to **In Interest of H.K.** implicates our High Court's holding in **In re D.C.D.** The salient facts of that decision are as follows. The agency sought to terminate the parental rights of an incarcerated father who was not identified as a birth parent when his daughter was born during 2011. The father was serving 7¾ to sixteen years of imprisonment, and he was not eligible for parole until 2018. During the ensuing dependency proceedings, the agency provided the father with few services and offered

only one video visitation and one in-person visitation. Recognizing that the father's parenting incapacity would continue at least until his daughter would be seven years old and could persist until his maximum release date, the trial court granted the agency's petition for involuntary termination of parental rights pursuant to § 2511(a)(2). The father appealed and we reversed, finding that the trial court erred in terminating the father's parental rights when the agency failed to provide him with reasonable efforts to promote reunification. Our Supreme Court granted review, reversed our decision, and reinstated the trial court's order terminating the father's parental rights.

In reversing our decision, the Supreme Court concluded that the agency's "reasonable efforts" were not elements of the statutory grounds to terminate parental right pursuant to § 2511(a)(2). The High Court reasoned,

> [A] child welfare agency cannot refuse reasonable efforts to an incarcerated parent and then point to the resulting erosion in the parental bond created by the agency as justification for termination of parental rights. The fact that such a scenario can be articulated, however, does not transform the provision of reasonable efforts to reunite parents and children into a requirement for termination. Nothing in the law goes so far, and the Superior Court erred in so holding.
>
> Further, while we acknowledge that other states have included reasonable efforts as either an element or merely a factor in their termination provisions, the Pennsylvania legislature has not incorporated reasonable efforts into the language of 23 Pa.C.S. § 2511(a)(2), and it would be improper and, indeed, unwise for this Court to add such an element to the statute by judicial fiat. In contrast, we recognize that the legislature included consideration of the reasonable services available to the parent in regard to another ground for termination, subsection 2511(a)(5) (providing for consideration of whether "the services or assistance reasonably available to the parent are not likely to remedy the

conditions which led to the removal or placement of the child within a reasonable period of time").

*Id*. at 672-73. Hence, the Supreme Court concluded that this Court erred in imposing the additional element of reasonable efforts under § 2511(a)(2), and in vacating the termination of parental rights despite the trial court's finding that the father was not capable of parenting and could not remedy the incapacity.

For similar reasons, we reject Mother's assertions herein. Plainly, the certified record does not support Mother's contention that OCY failed to exercise reasonable efforts. OCY provided reunification services to Mother and referred Mother to third-parties for services to help her satisfy the enumerated FSP goals. However, Mother refused to meaningfully participate in those referrals, and she failed to make any real progress towards reunification. Principally, while Mother implies that OCY denied her visitation with the children, the record reveals that Mother's visitation was suspended by the juvenile court based upon Mother's actions.

Likewise, the juvenile court, rather than OCY, imposed the requirement that Mother complete a mental health evaluation and comply with the recommended treatment before visitation would be reinstated. Furthermore, when OCY advised Mother that it would require her to comply with the court-ordered directive to complete a mental health evaluation before it would support her efforts to reinstate visitations, Mother failed to ensure that the entire evaluation report was delivered to the agency. Indeed, even on appeal,

Mother's argument is not that OCY ignored her accomplishment, or withheld support despite her achievements. Instead, she charges that neither she nor the agency could explain why the complete evaluation was not timely delivered. If Mother had provided the entire mental evaluation report, as requested, and OCY withheld its support for renewed visitation nonetheless, then her current claim would have a degree of merit. However, those predicate facts are absent. In reality, Mother neglected to provide OCY the entire evaluation until March 2018, a mere three months before OCY initiated the termination proceedings.

Additionally, while Mother suggests that she would have achieved her goals had she been granted visitation from the beginning of her dependency proceedings, the certified record belies this supposition. OCY adduced overwhelming evidence that Mother made minimal progress towards any of her goals. Indeed, as outlined by the following testimony that OCY adduced during the evidentiary hearing, the certified record confirms the orphans' court's determination that, despite OCY's best efforts, Mother failed to make any meaningful progress towards remedying the parental incapacity that brought S.B., P.B., and R.B. into care. Thus, the orphans' court's termination of Mother's parental rights pursuant to § 2511(a)(2) is consistent with **In re D.C.D.**, **supra**.

Ms. Spano, the OCY caseworker assigned to the family, testified that during the pendency of the case, Mother lost the housing that she secured

through the Your Way Home program. N.T., 8/3/18, at 225. Mother's contact with OCY was sporadic and she was difficult to reach by telephone. *Id*. at 228-29. To the extent OCY knew where Mother lived during that period, she resided at a shelter. *Id*. at 226. Mother did not report any effort to find stable housing. *Id*. At the time of the evidentiary hearing, Mother was living at the Salvation Army, but with their assistance, she hoped to secure housing by November 2018. N.T., 8/23/18, at 119, 131. The record does not reveal whether she was successful.

As it relates to employment, Mother sent OCY a picture of a certificate that she received for completing a job-training program, and claimed to have participated in a life-skills and employment program. N.T., 8/23/18, at 123-25; N.T., 8/3/18, at 226. However, Mother provided no additional information about her attempts to obtain employment and, as far as Ms. Spano was aware, Mother never obtained employment. N.T., 8/3/18, at 226. Without a residence or employment, Mother did not demonstrate she could financially provide for her children. *Id*.

With respect to mental health services, OCY introduced Dr. Miksic's psychological evaluation report dated September 2017. The report outlined, *inter alia*, Dr. Miksic's recommendation that Mother participate in individual therapy. *Id*. at 227. Mother never complied with the recommended treatment. *Id*. at 228. Although Mother reported that she was in group therapy, which she deemed sufficient, she did not document her progress in

that treatment. N.T., 8/23/18, at 123-25; N.T., 8/3/18, at 227-28. Indeed, Ms. Spano testified that Mother demonstrated no progress towards achieving the FSP goals since September of 2017. N.T., 8/3/18, at 351.

Similarly, Robert Gaskill, the caseworker who provided Mother with reunification services through a third-party referral, noted that Mother demonstrated limited compliance with the FSP. Mr. Gaskill began working with Mother in early July 2017, and closed his file August 23, 2017. N.T., 8/1/18, at 130. He attempted to concentrate on Mother's mental health, employment, and parenting. *Id*. at 132. During the evidentiary hearing, he testified that, while Mother initially expressed interest in the programs that he proposed, she was seldom steadfast and typically failed to follow through with her commitment. Eventually, Mother refused to answer the door when Mr. Gaskill arrived to provide services. *Id*.

One example of Mother's complacency related to the housing component of the FSP. At the outset of his intervention, Mr. Gaskill provided Mother a list of housing resources. *Id*. at 130-31. Mother made no effort to find housing, and seemed unconcerned about her inability to pay her rent. *Id*. Ultimately, she was evicted in August or September of 2017. *Id*. at 133.

Dr. Miksic, the court-appointed psychologist, highlighted an example of Mother's indifference toward her children's safety. He testified that Mother blamed S.B. for OCY's involvement with the family because the then nine-year-old runaway reported D.T.'s alleged abuse to his therapist. Mother

opined that, had the child approached her about D.T.'s conduct, rather than the authorities, she would have addressed it directly. *Id*. at 66. However, Mother conceded to Dr. Miksic that D.T. regularly struck, choked, and otherwise abused her children.[9] *Id*. at 29. Nevertheless, Mother made the children endure the abusive relationship with D.T. because she relied upon his financial assistance. *Id*.

The remainder of Dr. Miksic's testimony focused upon the forensic psychological/parenting evaluation and report dated September 2017. Dr. Miksic diagnosed Mother with dependent personality disorder, which he summarized as being dependent on others rather than dependent on herself. *Id*. at 36, 57. He further diagnosed Mother with adjustment disorder with disturbance of emotions. *Id*. at 37. He opined that Mother's parental capacity had a poor prognosis, as she had not demonstrated the ability to alter her attitudes and behavior in order to conform to the needs of her children. *Id*. at 37-38. In sum, Dr. Miksic described Mother as having a highly inadequate parenting capacity, which resulted in the children being exposed to trauma, cycles of instability, and a lack of adequate resources or positive parental

_____

[9] Mother testified that D.T. struck S.B. with a belt, kicked P.B. and grabbed her hair. N.T., 8/23/18, at 140-43. D.T. not only struck the children out of anger, but he also seized them by the neck and either elevated them of the ground or forced them against a wall. *Id*. 140-44. In addition, Mother described how D.T. would become angry with her and then threaten to throw their son, then six–month-old R.B., out of the window. *Id*. at 142-43.

modeling. *Id*. at 38. As it related to the prospect of visitations, Dr. Miksic noted his hesitation to endorse Mother's contact with the children without first engaging in therapeutic preparation. *Id*. at 48.

As the certified record demonstrates that Mother failed to make any meaningful progress towards remedying the underlying incapacity, abuse, or neglect that brought S.B., P.B., and R.B. into OCY's care, we affirm the orphans' court's determination that the agency established the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(2). Accordingly, we do not disturb it.

Next, we address the orphans' court's needs and welfare analysis pursuant to § 2511(b). While Mother does not directly assail the orphans' court's § 2511(b) analysis, she folds relevant arguments into her principal contention concerning the suspension of her visitation rights. In this vein, Mother argues:

> The court below makes the observation "with respect to [Mother], she also has not maintained a parental bond with any of her three children.["] Later[,] the court concludes[,] "As a result, this [c]ourt concludes that [Mother] now has no healthy parental bond with any of the three children S.B., P.B., and R.B., and has failed to do all that she reasonably could have done to recreate and promote such attachment with the children."
>
> Simply stated[,] [Mother] has been denied access to her children by the [c]ourt and OCY. Whatever parental bond there was, was destroyed and could not be restored since [Mother] was not permitted any access to the children.

Mother's brief at 9. (quoting the Orphans' Court Opinion, 9/14/18, at 21). For the following reasons, Mother's argument fails.

- 21 -

While the focus in terminating parental rights under § 2511(a) is on the parent, § 2511(b) concentrates on the child. ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). In reviewing the evidence in support of termination under § 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

When evaluating the parent-child bond, evidence of a parent's abuse and neglect is a relevant component of the analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Thus, the court may emphasize the safety needs of the child. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (internal citations omitted).

Instantly, the orphans' court concluded that the record supported terminating Mother's parental rights pursuant to § 2511(b), writing:

> With respect to [Mother], she also has not maintained a parental bond with any of her three children. As addressed above, [Mother] was denied even supervised visits with the children by [the j]uvenile [c]ourt. Had [Mother] cooperated with OCY, made progress on her other goals, demonstrated that she could be trusted to place the children's safety first, and not lied to the [c]ourt, she would have been in a better position to advocate for resumption of visits with the children . . . . Unfortunately, she did not put herself in a strong position so that a request for visits might be favorably considered. As a result, this [c]ourt concludes that [Mother] now has no healthy parental bond with any of the three children, S.B., P.B., and R.B., and has failed to do all that she reasonably could have done to recreate and promote such attachment with the children.

Trial Court Opinion, 9/14/18, at 21.

The record supports the orphans' court's conclusion that termination of Mother's parental rights satisfies the needs and welfare of S.B., P.B., and R.B. Preliminarily, the absence of any meaningful parent-child bonds in these cases is a consequence of Mother's failure to act. As previously noted, the juvenile court suspended visitation based upon Mother's in-court misrepresentations and it declined to reinstate visitations following Mother's disruptive outburst during the ensuing permanency review hearing. To the extent that the juvenile court's sanctions were draconian, Mother, who was represented by counsel at every proceeding, neglected to appeal the propriety of those decisions. Moreover, when Mother asked OCY about possibly reinstating visitation, the agency advised her to seek relief from the juvenile court who imposed the restriction. Mother simply failed to act.

Returning the focus of our discussion to the children, we observe that S.B., P.B., and R.B. are thriving in Mother's absence. Mother acknowledged that she has not had personal contact with her children in eighteen months. N.T., 8/23/18, at 132-33. During the hearing, Mother described her relationships with S.B. and P.B. prior to their placement as strained and inseparable, respectively, and she noted that she missed the toddler R.B. *Id*. at 133-34. However, Ms. Spano's testimony contradicts Mother's characterization of the family prior to OCY's intervention. She observed Mother as having a very chaotic parenting style where S.B. and P.B. had behaviors that were problematic. N.T., 8/3/18, at 231-33. Ms. Spano believed the children's behavior turned 180 degrees while in the care of their

pre-adoptive foster parents. *Id*. at 233-34, 238-41. Ms. Spano noted P.B. and R.B. have resided in the same foster home since they were removed from Mother's care, and S.B. joined them in June 2017. *Id*. S.B. initially had intense family-based services, but they have been decreased to more moderate wrap-around services because of his improvement in the foster home. *Id*. at 235. S.B. is very happy in the foster home, and his emotional and developmental needs are satisfied. *Id*. at 237-38. He has no desire to contact Mother. *Id*. P.B.'s behavior also improved, and Ms. Spano observed a dramatic and positive change during her stay with the foster family. *Id*. at 236, 239-40. As it relates to the then-nearly-two-year-old R.B., Ms. Spano noted that the toddler was talking, and that he looks to his pre-adoptive foster parents for comfort. *Id*. at 238, 240-41.

Dr. Miksic's hesitation to recommend Mother's reunification with the children is telling. During the evidentiary hearing, Dr. Miksic opined that all three of the children would likely need therapeutic preparation before they had any contact with Mother. N.T., 8/1/18, at 48. He testified, "[W]hether . . . any contact would be appropriate would be dependent upon any therapeutic results or opinions about the children's relationship with their mother even before any meetings." *Id*. Moreover, when specifically asked whether he would recommend that the family participate in immediate therapeutic preparation as a precursor to visitation, Dr. Miksic reasoned, "Based on the information that I would have, I would not recommend contact.

I would leave that opinion to the individuals who have been providing the care and supervision to the children." *Id*. at 49.

All of the foregoing evidence confirms that S.B., P.B., and R.B. reside in a loving home, with foster parents who care for the children and meet their needs. While Mother may profess to love S.B., P.B., and R.B., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (internal citations omitted). The record supports the orphans' court's conclusion that the termination of Mother's parental right satisfies the developmental, physical and emotional needs and welfare of S.B., P.B., and R.B. pursuant to § 2511(b).

Accordingly, we discern no abuse of discretion or error of law, and conclude that the orphans' court appropriately terminated Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/19