532 A.2d 1218

**In re J.G.J., Jr.**

**Appeal of John Gary JOSE.**

Superior Court of Pennsylvania.

Argued Sept. 3, 1987.

Filed Oct. 28, 1987.

James T. Owens, West Chester, for appellant.

Before CAVANAUGH, ROWLEY and MONTEMURO, JJ.

MONTEMURO, Judge:

J.G.J., Sr., father of the minor child, J.G.J., Jr., appeals from the final decree of the Court of Common Pleas of Chester County denying his petition for involuntary termination of the parental rights of L.H., mother and appellee herein. This later decree reverses an earlier *decree nisi*, dated August 8, 1986, which terminated the parental rights of appellee, L.H. Upon a thorough review of the record, and application of the appropriate standard of review, we affirm.

J.G.J., Sr. and L.H. lived together sporadically from June 1979 to December 1981. J.G.J., Jr. was born September 26, 1979. Following the separation of his parents in December, 1981, J.G.J., Jr. resided with L.H. during the week and spent weekends with J.G.J., Sr. However, following a weekend visit in May of 1982, J.G.J., Sr. refused to return the child to L.H.'s custody after he discovered a burn on the child's back.[1] From May of 1982 to present, J.G.J., Jr. has

---

1. It is uncontroverted that the burn occurred accidentally when L.H.'s sister spilled hot tea on the child's back. During the termination hearing, J.G.J., Jr.'s paternal grandmother testified that she had observed the burn on the weekend that J.G.J., Sr. discovered it and she testified that the burn "was healing with·scabs." She testified that there was no infection. (N.T. at 60). We believe that it is significant that this case did *not* involve allegations of child abuse or neglect on the part of L.H.

resided with his father and his father's wife.[2]

Between May of 1982 and June of 1983, L.H. testified that she visited her son five times and made approximately ten phone calls to him. (N.T. at 126.) However, she stopped calling her son when she was told that the calls were upsetting the child. (*Id.* at 125–126 and 142.) She testified that she visited her son only five times during this period because further visitation was not permitted by J.G.J., Sr. (N.T. 125–126 and 142.) On June 30, 1983, L.H. filed an action for custody of J.G.J., Jr. After a conciliation conference on August 1, 1983, the court issued a temporary order allowing L.H. to visit her son on alternating Sundays for two hours at the home of J.G.J., Jr.'s paternal grandmother. The court further directed that both parties attain the services of a psychologist in connection with the pending custody action.

From August 1983 to November 1984 L.H. did travel from her home in Delaware County to visit J.G.J., Jr. at the home of his paternal grandmother in Chester County. The trial court found that out of thirty-seven scheduled visits in this time period, L.H. was not able to attend thirteen. L.H. testified that she missed some of the visits because she gave birth to a child in July, 1984. L.H. further explained that she was not always able to arrange transportation for the visits. Although there was testimony to the contrary, L.H. testified that she telephoned J.G.J., Jr.'s grandmother when she had to cancel a visit.

On November 14, 1984, counsel for J.G.J., Sr. wrote to L.H.'s counsel stating, *inter alia:*

For reasons which shall become obvious, I have instructed my clients to preclude visitation with the youngster by your client. My reason is that on several occasions there have been threatening phone calls including one phone call wherein my client's fiance was advised

2. J.G.J., Sr. and his wife were married in July, 1985. J.G.J., Sr.'s wife testified that it was her intention to adopt J.G.J., Jr. if this became possible. (N.T. at 89.)

that the child would be killed rather than arrangements continuing as they are presently.

As a result of this letter, L.H. received the following letter dated November 16, 1984 from her attorney:

On November 15, 1984, I was telephoned by James Owens, [J.G.J., Sr.'s] attorney, concerning your case. At that time, Mr. Owens stated that his client had told him that you have recently threatened your son's life. Based on these threats, [J.G.J., Sr.] will no longer permit you to visit with your son until other arrangements are made between Mr. Owens and myself.

At the termination hearing, J.G.J., Sr.'s wife testified that in October 1984 she had received the threatening phone calls at home. Although she knew that the voice was female, she did not recognize the voice. (N.T. at 88.) L.H. testified that she never had the home address or home phone number of J.G.J., Sr. and his wife and L.H. denied making the threatening phone calls. (N.T. at 135.)

In December of 1984, L.H.'s attorney informed her that the custody action could not proceed until L.H. paid the outstanding bill for the court ordered psychological examination. L.H. testified that she did not pay the bill because she could not afford to do so.[3] It is undisputed that between October 14, 1984 and July 22, 1985, there was no contact between L.H. and her son. As a result, on July 22, 1985, J.G.J., Sr. filed a petition to terminate the parental rights of L.H.

■ Parental rights may not be terminated in the absence of evidence which is clear and convincing. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re T.R.*, 502 Pa. 165, 166, 465 A.2d 642, 642–643 (1983). In Pennsylvania, courts applying this standard have re-

---

3. L.H.'s outstanding bill was for $225.00. Although L.H.'s financial status in 1984 was not clearly established at the termination hearing, L.H. had been receiving Public Assistance during 1982–1983 and she was being represented by Legal Aid of Chester County in both the custody action and the termination proceeding. In November of 1984, L.H. was caring for her two other children and residing with her boyfriend who was working as a plumber but not on a steady basis.

quired that the evidence be "so clear, direct, weighty, and convincing as to enable the [factfinder] to come to a clear conviction without hesitancy, of the truth of the precise facts in issue." *In re Jackson,* 267 Pa.Super. 428, 431, 406 A.2d 1116, 1118 (1979) (citation omitted).

■ Our scope of review in termination of parental rights cases is limited to a determination of whether the decision is supported by competent evidence. *In re Adoption of Faith M.,* 509 Pa. 238, 501 A.2d 1105, 1106 (1985); *In re Shives,* 363 Pa.Super. 225, 525 A.2d 801 (1987). If our comprehensive review of the record does not reveal an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's findings, the order must stand. *Lookabill v. Moreland,* 336 Pa.Super. 520, 523, 485 A.2d 1204, 1205 (1984); *See also In re Adoption of G.T.M.,* 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984); *In re Stickler,* 356 Pa.Super. 56, 58, 514 A.2d 140, 141 (1986).

J.G.J., Sr. petitioned for termination of appellee's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1):

The right of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: The parent by conduct continuing for period of at least six months ... has refused or failed to perform parental duties.

In the case at bar, it is undisputed that between October 14, 1984 and July 22, 1985, there was no contact between J.G.J., Jr. and his mother, L.H. However, this court has recognized that even where it is conclusively established that a parent has failed to perform parental duties for a period in excess of six months, such a finding does not, in and of itself, support an order terminating parental rights. *In re T.L.G.,* 351 Pa.Super. 256, 505 A.2d 628 (1986). Rather, the nonperformance of parental duties must be evaluated under the totality of the circumstances confronting the particular parent. Consideration must be afforded to any explanation offered by the parent for his failure to perform parental obligations. Indeed, in *In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977), our supreme court stated:

A finding of abandonment, which has been characterized as "one of the most severe steps the court can take," *Sarver Adoption Case*, 444 Pa. 507, 509, 281 A.2d 890, 891 (1971), will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may result only when a parent has failed to utilize all available resources to preserve the parental relationship. (Citations omitted.)

*Id.*, 474 Pa. at 625, 379 A.2d at 540. It is well established that before parental rights may be terminated, the parent's performance must be measured in light of what would be expected of an individual in circumstances which the parent under examination finds himself. *In re Adoption of B.D.S.*, 494 Pa. 171, 431 A.2d 203 (1981); *In re Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978).

We find that the circumstances confronting the mother of J.G.J., Jr. in this case are closely analogous to those circumstances in *Matter of Adoption of Barnett*, 304 Pa.Super. 514, 450 A.2d 1356 (1982). In *Barnett*, appellant's son was detained in a Children's Services' foster home after appellant was found to be truant from school and sent to Waynesburg Juvenile facility. Upon her release, Children's Services gave appellant "goals" that she had to meet before her son would be returned to her. Children's Services later filed a petition to involuntarily terminate appellant's parental rights because the agency believed appellant had not made sufficient progress toward reaching her "goals." The trial court terminated appellant's parental rights to her son, and we reversed. At the time of filing the petition, Children's Services advised appellant that she could not longer visit her son pending disposition of the petition. We noted in *Barnett* that the trial court's decision to terminate parental rights was based primarily on the fact that during the year between the filing of the termination petition and the final hearing, appellant made no attempt to call Children's Services to inquire about her son. In *Barnett*, we stated:

We find that this basis for the court's decision must be rejected as a 'Catch–22'. Alice was forbidden by Children's Services from contacting her child; Alice cannot, therefore, be held accountable for her failure to continue visiting her child as she had been doing. Neither do we find the court's latter conclusion to be a basis upon which to terminate parental rights. The rule is that a parent is to maintain a place of importance in his child's life, which means that the parent has an affirmative duty to 'love, protect, and maintain communication and association with that child.' *In re Adoption of McCray*, 460 Pa. 210, 216, 331 A.2d 652, 655 (1975). It must not be forgotten, however, that the measures taken by the parent to demonstrate his or her interest in a child must be viewed in light of the existing circumstances. *In re Adoption of Infant Male a/k/a J.P.M.*, 485 Pa. 77, 401 A.2d 301 (1979). In the instant case, owing to the position of Children's Services regarding appellant's visitation rights, communication and association with the child by appellant was prohibited. In this respect, appellant's case is more akin to those cases where the court found that the custodian of the child prevented the natural parent from performing the duties, such as communication and association, that otherwise would have been required. *See e.g., In re D.J.Y.*, 487 Pa. 125, 408 A.2d 1387 (1979); *In re Adoption of Vaders*, 444 Pa. 428, 282 A.2d 359 (1971). More pertinent conclusions can be deduced from an examination of appellant's conduct during that period in which visitation was permitted, which would be from March 1979 to March 1980. During this time, Alice saw her child at least once a week, for half a day.

*Matter of Adoption of Barnett, supra,* 304 Pa.Superior Ct. at 523, 450 A.2d at 1360. (Citation omitted.) L.H. was in a similar "Catch–22" position during the period of October 14, 1984 through July 22, 1985, when it is claimed that she failed to perform her parental duties. L.H. testified that when she received the November 16, 1984 letter from her attorney, she believed it meant that the *court* had decided she could no longer visit her son. (N.T. at 102). Even though the letter did not

state that the *court* had terminated L.H.'s visitation rights, the letter clearly communicated to L.H. that she could no longer visit her son as she had been doing pursuant to the June 1983 court order. L.H. explained that she did not make any phone calls during this period to inquire about the well-being of her son because she was afraid she would again be accused of making threatening phone calls. (N.T. at 123.) Finally, L.H. testified that she did not send cards to her son during this period because she believed he was not being given the cards and gifts she sent to him. Before November of 1984 and following July of 1985, L.H. testified that she did send her son cards on holidays. (N.T. at 108 and 122.)

The trial court, in refusing to terminate L.H.'s parental rights, relied on *In re D.J.Y.*, 487 Pa. 125, 408 A.2d 1387 (1979). There, the parents of the minor child were separated and the child resided with paternal grandparents. The appellee and her husband were later reunited. Appellee continued to visit her son at the home of his grandparents because her husband told her that the grandparents had legal custody of the child but assured her that he planned to resume custody when he was financially able. The couple separated again. Appellee's husband arranged for appellee to visit their son once following this latter separation. Appellee testified that the gifts she sent for her son were not given to him by his father or his grandparents. The trial court, affirmed by the supreme court, declined to terminate appellee's parental rights, finding that the actions of appellee's husband and the paternal grandparents thwarted appellee's efforts to remain a positive force in her son's life.

We find that in this case, as in *In re D.J.Y.*, barriers thwarted L.H.'s efforts to manifest a continuing interest in J.G.J., Jr. We recognize that the parental duty is an affirmative duty, requiring a continuing and genuine effort to maintain communication and association with the child. However, as of November 16, 1984, J.G.J., Sr. expressly prohibited L.H. from physically visiting with her

son. Further, we believe that L.H.'s failure to telephone to inquire about her son after being accused of making threatening phone calls is understandable. We emphasize that a parent's efforts in maintaining a relationship with her child must be evaluated in light of obstacles confronting that parent. *In re Adoption of J.S.M., Jr.,* 492 Pa. 313, 424 A.2d 878 (1981). Finally, we reject appellant's argument that this case is controlled by the decision of our supreme court in *Matter of Adoption of David C.,* 479 Pa. 1, 387 A.2d 804 (1978). In *Matter of David C.,* the court suggests that an attorney's advice that a court probably would not award custody or visitation to his client would not justify his client's failure to visit his child. *Id.,* 479 Pa. at 11, 387 A.2d at 809. *See also In re Adoption of Baby Boy J.,* 354 Pa.Super. 575, 512 A.2d 689 (1986). The case at bar does not involve any advice on the part of counsel that L.H. not visit her son. Counsel's letter to L.H. dated November 16, 1984 simply informed her client that J.G.J., Sr. had decided to terminate L.H.'s visitation with her son.

Appellant, J.G.J., Sr., argues that L.H. took a passive stance with regard to the custody proceeding she had initiated in June of 1983 and that this evidenced a failure to make a genuine, sincere effort to maintain a place of importance in J.G.J., Jr.'s life. We disagree. During October of 1984 and July of 1985, L.H. did not proceed further with the custody proceeding because her attorney advised her that she had to first pay the outstanding bill for psychological services. We note that the attorney for the minor child J.G.J., Jr. filed a brief in support of exceptions filed by counsel for L.H. following the trial court's initial order terminating the parental rights of L.H. In his brief, counsel for J.G.J., Jr. stated:

> However, it is my opinion after interviewing the respondent and listening to her testify in Court, that she clearly lacked the requisite sophistication to realize that she could have proceeded despite her lack of financial resources. If, as in a case like this, a lay person who is obviously lacking in any legal sophistication is advised by

her attorney that she needs to pay money to a psychologist in order to proceed, how can we expect her to be sophisticated enough to inquire about alternatives? I am convinced that had her counsel advised her at that time that a petition was going to be filed on her behalf to have a court appointed psychologist at no cost to her that she would have cooperated in the process and the custody/visitation case would have proceeded.

Where a parent makes reasonable attempts to overcome obstacles created by the party seeking to terminate parental right, "a mere showing that the [parent] could conceivably have pursued legal action more promptly cannot justify termination of parental rights." *In re D.J.Y.*, 487 Pa. 125, 132, 408 A.2d 1387, 1390 (1979) (quoting *Adoption of S.H.*, 476 Pa. 608, 616, 383 A.2d 529, 533 (1978)). In this case, we find it significant that it was L.H. who filed for legal custody of J.G.J., Jr. in June of 1983. Following this, she traveled on numerous occasion to visit J.G.J., Jr., as she was permitted to do by temporary court order. After J.G.J., Sr. refused to permit the visitation to continue in November of 1984, L.H.'s hands were tied. She knew she could not visit her son, and she was afraid to make phone calls concerning him. Her attorney advised her that she could not proceed with the custody action until L.H. paid the outstanding bill for psychological services. Counsel for L.H. apparently never attempted to seek any payment for this bill by court petition.

This court is mindful of the irreversible nature and serious emotional impact which necessarily follow an involuntary termination of parent rights. *In re Adoption of Orwick*, 464 Pa. 549, 347 A.2d 677 (1975). Our supreme court has recently stated that the requirement that a parent's right to a relationship with his child can only be terminated on clear and convincing evidence "arises out of our deep conviction that the bond of family love will enable most parents to give better care to their children than the best that anyone else can provide." *Baby Boy A. v. Catho-*

*lic Social Services,* 512 Pa. 517, 523, 517 A.2d 1244, 1247 (1986).

We have very carefully examined the record in this case before us, and we find, as did the trial court, considering the totality of the circumstances, that the record does not support a determination that appellant, J.G.J., Sr., has proved by clear and convincing evidence that appellee, L.H., has exhibited such unexplained failure to perform parental duties as would justify involuntary termination of parental rights. We therefore affirm.

Order affirmed.