**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.R.B, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF B.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1112 MDA 2021 |

Appeal from the Decree Entered July 15, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9080

BEFORE:  LAZARUS, J., NICHOLS, J., and KING, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED MARCH 09, 2022**

Appellant B.V. (Mother) appeals from the order granting the petition filed by Appellees B.J.B. (Father), and B.M.B. (Stepmother) (collectively, Petitioners), involuntarily terminating her parental rights to B.R.B. (the Child), born in May of 2015.  Mother argues that the orphans' court erred in concluding that Petitioners presented clear and convincing evidence supporting the termination of her parental rights.  We affirm.

The orphans' court summarized the facts of this matter as follows:

[Father] testified that he is currently married to [Stepmother]. Their marriage took place on September 29, 2019.  Father was previously married to Mother on November 17, 2015 after [the Child's] birth in May of 2015.  Father indicated that he and Mother divorced on May 16, 2018.

. . . Father stated that he and Mother separated in the beginning of 2016.  Father testified that up until 2018, he and Mother had shared custody of [the Child] without a custody order.  He stated that the shared custody arrangement changed when he picked up [the Child] from Mother's residence and was informed by [the

Child] that Mother's paramour had hit him and [the Child] had marks on him. Father indicated that he took his son to the hospital and then he was notified by a caseworker from Luzerne County Children and Youth [(the Agency)] to contact the Agency. Father also filed an emergency petition for custody in Luzerne County. Father was awarded primary physical custody of [the Child] and Mother was given supervised visits of [the Child].

Father indicated that the custody order, entered in February of 2019, prohibits Mother from allowing . . . her paramour, from having any contact with [the Child]. A subsequent order, dated June 4, 2019[,] further directed Mother to submit to a hair follicle screen.

\* \* \*

Father stated that the last time that Mother saw [the Child] was in August 2019. Father testified that he decided to stop the Child from having any contact with Mother due to Mother's violations of the February 2019 court order and the June 4, 2019 court order when Mother permitted her paramour to have contact with [the Child] and Mother refused to submit to a hair follicle screen. [Stepmother also testified that she told Mother that Mother could not see the Child if Mother failed to comply with the existing custody orders.] . . . . Mother never filed any pleadings with the court alleging Father's contempt of the court order or for the purpose of resuming visits with [the Child]. Father also stated that Mother did not contact him in any way since August 2019 in order to resume supervised visits. Father stated that Mother had his cell phone number should she wish to contact him in order to see the Child.

Father testified that he never "blocked" Mother's telephone number on his cell phone. . . . Father indicated that from August 2019 until the filing date of the petition to terminate Mother's parental rights on September 29, 2020, Mother had not tried to contact Father through his cell phone in order to see [the Child]. . . . Father testified that he never hid his address nor his telephone number from Mother. He also stated that he never "blocked" Mother from his social media accounts such as Instagram or Facebook. Father stated that he is not "friends" with Mother on Facebook[, therefore] he would not have received her messages [and instead those messages would go to a] separate mailbox which is usually full of spam e-mail and he doesn't check

that mailbox. . . . [Additionally, Father testified that he never saw messages from Mother on Instagram.]

Father testified that when he and Mother were separated from one [an]other, they texted each other frequently via cell phone as a form of communication. . . . Father indicated that since August 2019, Mother has not performed any parental duties for [the Child].

Father testified that after the entry of the February 2019 court order, Mother visited [the Child] approximately four (4) or five (5) times. Father also testified that he moved to a new address. Father indicated that Mother was aware of his new address because she came to his residence to pick up [the Child] on at least two occasions. [Stepmother also testified that Mother came to their home several times to pick up the Child.]

\* \* \*

Father also testified that Mother permitted her paramour to have contact with [the Child] contrary to the February 2019 court order. Father testified that in August 2019, he dropped off [the Child] at the maternal grandmother's home where Mother was staying. Father returned to pick up [the Child]; however, the Child was not present and [Father] was advised to pick up [the Child] at a different address which, according to Father, was the residence of Mother's paramour. Father testified that when he went to pick up [the Child] at the paramour's residence, he did not see Mother's [paramour] at the residence, but believed that he was inside since it was his home. Mother denied that her paramour was inside the home and claimed that he was working. Mother also testified that Father was mistaken and . . . . that Father picked up [the Child] at her paramour's sister's home and not her paramour's home. . . . Mother claimed that she stayed with her mother, but during that time she was "bouncing around" and she would either stay with her mother or with her paramour.

Father stated that Mother had previously admitted to him that [the Child] was in contact with her paramour. He stated that in 2019 when Mother dropped off [the Child] at Father's home, her paramour was with [the Child] in the vehicle. Father stated that he confronted Mother on this matter and Mother responded that her paramour was her only ride. . . . Mother denied that her paramour was in the vehicle. She stated that her uncle was the one that was in the vehicle.

- 3 -

Mother testified that up until 2018, she had shared custody of [the Child] with Father; however, she stated that Father was always at work so the Child was with her most of the time. Mother testified that in 2018 she had her second child with her paramour. Mother stated that she was subsequently admitted to First Hospital to address mental health concerns. When Mother discovered that [the Agency] opened a case regarding her son, Mother stated that she discharged herself from First Hospital against medical advice. Mother testified that she was found unfit because she was not participating in ongoing therapy or taking her medications.

\*     \*     \*

Mother testified that she changed her cell phone so many times and was not able to save Father's cell phone number on her cell phone in order to contact him to see [the Child]. She, therefore, attempted to contact Father through social media. Mother testified that she and Father were "friends" on Facebook until 2019. Mother stated that she forgot her password to [her former] Facebook [account] and therefore had to obtain a new account. As a result, she was no longer "friends" with Father on Facebook.

Mother claimed that she sent many messages to Father on her former Facebook account begging him to see the Child or talk to him. . . . Mother testified that she still wanted to be around her son . . . . Mother claimed that she was sending "Happy Birthdays" and "Merry Christmas" greetings to the Child as well as letting Father know that she had gifts for her son and that she really missed him. Mother stated that in 2020, she sent many messages to Father asking about [the Child] every other week or two.

Mother also testified that she kept sending messages to the Father on Instagram requesting to see the Child from August 2019 until a few months prior to the trial date on January 13, 2021. According to Mother, Father never responded to her messages on Instagram. [Mother did not present any evidence that she sent these social media messages or that Father ever received any of them.]

Mother testified that Stepmother responded to her Instagram message regarding wanting to see [the Child] and stated that Stepmother and Father wanted Mother to submit to a drug test. Mother indicated that she would only submit to a drug test if everybody (presumably Father and Stepmother) also was directed to submit to a drug test.

When Mother was questioned as to the reason that she did not file a petition for contempt against Father for her inability to see her son, Mother responded that she did not have the finances to retain an attorney. Mother was questioned on cross examination that since she had an attorney that represented her *pro bono* in prior hearings, why she did not use the same counsel to represent her further in the custody proceedings. Mother claimed that her [*pro bono*] attorney would not return her calls. Mother testified that she also contacted many lawyers to represent her, but was not able to afford the fee. Mother stated that she did not call Luzerne County Family Court in order to inquire as to her ability to proceed on a *pro se* basis. She stated she was not aware that it was an option.

Mother admitted upon cross examination that she had free legal representation from North Penn Legal Services to represent her in her custody proceedings. At the initial court proceeding, Father was awarded primary physical custody pursuant to a petition for emergency special relief filed by Father. Mother's attorney filed a petition for review conference which resulted in Mother being awarded partial physical custody of the Child every Tuesday and every other weekend. Mother further admitted that her attorney also filed another petition in court in June 2019 in [an] attempt to obtain shared physical custody of the Child. As a result of the petition, a review conference was scheduled by the court sometime in June 2019. At the hearing in June, Mother was ordered to submit to·a drug screen. Mother admitted that she was represented by counsel and that she was under court order to submit to a drug test. She further admitted that she refused to submit to the drug test.

When Mother was questioned upon cross examination as to the reason that she did not comply with the court order, Mother stated that she relied on her attorney who indicated to her that he was going to amend the Court order so that she did [not have] to submit to a drug test. Mother admitted, however, that the Court order was never amended. Furthermore, Mother testified that she did not think that she should be the only one at the hearing who was directed to submit to a drug test and not the Father.

. . . . Mother refused to submit to the drug screen claiming that she was already submitting to random drug screens through [the Agency] during that time frame. However, contrary to Mother's testimony, [Nicole] Nickolich[, an Agency caseworker] testified that the only drug screen that Mother submitted to was in

September of 2019 for which she tested negative and she was scheduled for another drug screen on July 13, 2020 for which she failed to submit.

* * *

Mother admitted upon cross-examination that she had not seen her Child since August 2019. She admitted that Father was not going to permit her to see the Child until she submitted to a drug test, in addition to Father's belief that Mother was permitting her paramour to have contact with [the Child].

Mother further testified that she did not go to Father's residence in order to see [the Child] due to both Father and Stepmother telling her that she was not permitted on the property. Mother stated that they told her that they would call the police if she came onto their property. Father testified that after he stopped Mother's visits in August of 2019, he never told Mother that if she came to his residence that he would call the police and have her arrested. . . . Stepmother testified that she never told Mother that if she showed up at her residence, she would be arrested.

When Mother was questioned as to how the Child was retrieved from Father's home for her periods of custody, Mother indicated that she had her great grandmother pick up [the Child] for visits. Mother testified that she wanted to send gifts to [the Child] at Father's home; however, she did not know the address. She stated that she was not able to retrieve the address from her mother because she and her mother had a "falling out". Mother testified that the "falling out" with her mother lasted for one year and her grandmother would not speak to her. She, therefore, stated that she was not able to obtain the address for Father's residence. Of course, no explana[]tion was given as to why she did not request Father's address from Father himself.

* * *

Father testified that he meets the Child's physical needs by making sure that he is fed and healthy. Father indicated that when he is not working, he takes the Child to his doctor's appointments. Father indicated that he meets the Child's developmental needs by helping him with his homework. Father also stated that he meets the Child's emotional needs. When he arrives home from work, he plays with the Child and tucks him in to bed at night.

- 6 -

Father stated that his son also has a strong bond with his stepmother. Father stated that his Child told him that "he loves his mommy" [*i.e.*, Stepmother]. According to Father, [Stepmother] is loving, nurturing and caring for [the Child]. Father indicated that the Child is very comfortable around Stepmother. Father stated that he has two stepdaughters. According to Father, the youngest stepdaughter and [the Child] are "attached to the hip". Father testified that since [the Child] stopped seeing his Mother, [the Child is] not showing any difficulties from the separation. Father stated that he would like [Stepmother] to adopt [the Child] which he believes would be in [the Child's] best interest. Father testified that [Stepmother] has been acting as his son's mother for the past two years. According to Father, his son loves Stepmother and "has taken to her very well".

. . . . Father testified that when [the Child] stopped seeing his Mother in August 2019 he did not ask about his Mother. Father testified that after he did see his Mother for a weekend, there would be some behavioral issues with [the Child] for a day or two.

\* \* \*

Stepmother testified that she has a very strong relationship with [the Child]. She stated that they do everything together. Stepmother indicated that they do everything as a family and that he loves being with her two daughters. Stepmother testified that when [the Child] stopped seeing his mother, she did not notice any problems or issues with [the Child]. Stepmother testified that [the Child] appears very happy.

Stepmother testified that she meets [the Child's] physical needs. According to Stepmother, she feeds [the Child]. She bathes him, changes his clothes and does his laundry. Stepmother also indicated that she and Father take [the Child] to his doctor's appointments and to dental appointments.

Stepmother stated that she also meets the Child's developmental needs. She stated that she homeschools [the Child] through Commonwealth Charter Academy. In fact, she indicated that she homeschools all three children. . . .

Stepmother testified that she wants to adopt [the Child]. She testified that she has been acting as [the Child's] mother for the last few years and that they have a very strong bond. Stepmother testified that if she is permitted to adopt [the Child], she would

> treat him as her naturally born son. Stepmother also testified that she understood that she would have legal rights and obligations toward [the Child] if she is permitted to adopt him. When Stepmother was questioned as to whether [the Child] ever talked about his mother, she responded that one time he drew a picture of his Mother and her paramour and how they were mean to him.

Orphans' Ct. Op., 9/13/21, at 2-3, 5-8, 11-15, 18-20 (citations omitted and formatting altered).

The orphans' court held a virtual hearing on the petition to involuntarily terminate Mother's parental rights on January 13, 2021. At the hearing, the court heard testimony from Father, Stepmother, Mother, Maternal Grandmother, and Nicole Nickolich, an Agency caseworker. Additionally, the guardian *ad litem* (GAL)[1] argued in favor of termination of Mother's parental rights.

On July 15, 2021, the orphans' court issued a decree involuntarily terminating Mother's parental rights to the Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). Orphans' Ct. Decree, 7/15/21.

On August 13, 2021, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P

---

[1] The orphans' court appointed Marsha Ann Basco, Esq. as Child's GAL and legal counsel pursuant to Section 2313(a) on September 3, 2020. The orphans' court found that there was no conflict between the Child's best interests and legal interests. *See* Orphans' Ct. Order, 2/16/22; *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020) (stating where a GAL was appointed to represent both the child's legal and best interests, appellate courts may review *sua sponte* "whether the orphans' court determined that the child[ren]'s best interests and legal interests did not conflict").

1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion addressing Mother's claims. *See* Orphans' Ct. Op. at 3-22.

On appeal, Mother raises a single issue for our review: "Whether the [orphans'] court erred in finding that Petitioners proved the elements of Section 2511(a)(1) and Section 2511(b) through clear and convincing evidence?" Mother's Brief at 4 (formatting altered).

In reviewing Mother's claims, we are guided by the following principles:

> Appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation and quotation marks omitted).

This Court has explained that

> [o]ur case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child.

***In re C.L.G.***, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citations omitted).

"This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." ***In re M.T.***, 101 A.3d 1163, 1178-79 (Pa. Super. 2014) (*en banc*) (citation omitted).

## Section 2511(a)(1)

Mother argues that the orphans' court erred in concluding that there was clear and convincing evidence that Mother had shown a settled purpose of relinquishing her parental rights and/or failed to perform parental duties for at least six months prior to the filing of the instant petition. Mother's Brief at 8-12. Mother contends that once a failure to perform parental duties has been established, the court must consider, among other things, the explanation for the conduct, and all of the surrounding circumstances. *Id.* at 8-9 (citing, *inter alia*, **Matter of Adoption of Charles E.D.M., II**, 708 A.2d 88, 92 (Pa. 1998)). Specifically, Mother asserts that the grounds for termination under Section 2511(a)(1) were not met because the Petitioners prevented Mother from performing her parental duties by telling Mother she could no longer see the Child and that if she went to Petitioners' home she would be arrested. *Id.* at 9-10 (citing, *inter alia*, **In re J.G.J., Jr.**, 532 A.2d 1218 (Pa. Super. 1987)). Mother claims that her testimony demonstrated she was "not well versed in custody law and was not fully aware of the options available to her[]" and that she was saving money to hire an attorney. *Id.* at 11 (citation omitted). Further Mother argues that the **J.G.J., Jr.** Court recognized that "the fact that a parent could have pursued legal action more promptly does not justify termination of parental rights." *Id.* at 10 (citation omitted). Additionally Mother argues that Father's testimony was not credible. *Id.* at 11-12.

Petitioners respond that Mother's admissions established that she refused or failed to perform parental duties since August of 2019. Petitioners'

Brief at 11-12.  Petitioners also argue that Mother failed to demonstrate that she exhibited reasonable firmness in attempting to overcome any barriers she may have confronted in trying to maintain her relationship with the Child.  *Id.* at 13-14.  The GAL/Child's legal counsel did not file a brief.

Section 2511(a)(1) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition."  *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (emphasis in original).  "Although it is the six months immediately preceding the filing of the petition that is most critical in the analysis, the trial court must consider the whole history of given case and not mechanically apply the six-month statutory provision."  *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

This Court has explained:

There is no simple or easy definition of parental duties.  Parental duty is best understood in relation to the needs of a child.  A child

> needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations and internal quotation marks omitted).

In ***B., N.M.***, the Court rejected the father's claim that his ignorance of the law and lack of information about the mother's new telephone number prevented him performing his parental role while he was incarcerated. ***Id.*** at 856-57. Specifically, the Court held that although "the [f]ather was not required to perform the impossible, he was obligated to act affirmatively to maintain his relationship with Child, even in difficult circumstances[]" and that "the [f]ather failed to act to the best of his ability to meet his obligation despite

- 13 -

his incarceration and the obstacles [the m]other placed before him." *Id.* at 857.

In *J.G.J., Jr.*, the trial court denied the father's petition to terminate the mother's parental rights. In that case, the mother exercised visitation with the child at the home of the child's paternal grandmother pursuant to a custody order. *J.G.J., Jr.*, 532 A.2d at 1219-20. The father, through his counsel, informed the mother that she could no longer visit the child after, among other things, an unidentified woman made threatening phone calls to the father's home. *Id.* at 1220. The mother also ceased to make phone calls asking about the child's well-being, however, the *J.G.J., Jr.* Court concluded that this was understandable in light of the accusations about threatening phone calls. *Id.* at 1222. Further, the mother's counsel told her that the custody action would not proceed until the mother paid an outstanding bill for the court-ordered psychological examination. *Id.* at 1220, 1223. In affirming the trial court's order on appeal, this Court concluded that "[w]here a parent makes reasonable attempts to overcome obstacles created by the party seeking to terminate parental right, a mere showing that the parent could conceivably have pursued legal action more promptly cannot justify termination of parental rights[]" and affirmed the trial court's decree denying the petition to terminate the mother's parental rights. *Id.* at 1223 (citation omitted and formatting altered).

Where the petitioners have presented clear and convincing evidence that a parent has demonstrated a settled purpose of relinquishing parental

rights or has refused or failed to perform parental duties, "the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." **Charles E.D.M., II**, 708 A.2d at 91 (citation omitted).

Additionally, our Supreme Court has explained that

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

**Id.** at 1119 (citations omitted).

Here, in addressing Section 2511(a)(1), the orphans' court explained:

The court finds that based upon the testimony adduced at trial, [] Mother has refused or failed to perform her parental duties not only within the six (6) months prior to the filing of the Petition for Termination of Parental Rights on September 29, 2020, but for a period of one year beyond that specific time frame. Under the current custody order, Mother is afforded periods of partial physical custody. While Father admitted that he forbade Mother from exercising those opportunities due to her alleged violation of the order wherein he believes she permitted contact between [the Child] and her paramour, Mother has acquiesced and has remained silent and inactive in pursuing her custody rights and by extension, her motherhood of [the Child].

\* \* \*

The court does not find Mother's testimony to be compelling nor credible. Mother had countless opportunities to seek visits with

- 15 -

the Child. First and foremost, all Mother had to do was comply with the June 4, 2019 [custody] order, *i.e.* submit to a hair follicle test as directed by the [custody] court. Mother was more concerned about the fairness of the order wherein she took the position that if she had to submit to a screen, Father and Stepmother should also. If Mother truly wanted to resume her relationship with her son she should have submitted to the hair follicle test.

Also, Mother failed to take any action to reinstitute her contact with her son, either through a formal court proceeding or by reaching out to Father via cell phone. There was no need to resort to social media when Father had not changed his cell phone number and was able to be reached directly. Mother previously had Father's cell phone number and claims that she has changed cell phones and lost his telephone number. Had Mother simply pursued obtaining Father's cell phone number, she could have phoned Father, obtained his address and potentially could have reached an agreement as to the resumption of her contact with [the Child].

This court notes that we live in a digital age. The opportunity to obtain personal information, specifically addresses, is inescapably simple. Furthermore, Mother states that her own mother and grandmother had Father's address and would not give it to her due to a "falling out" between them. The maternal grandmother did testify on behalf of Mother, yet she did not corroborate Mother's testimony by stating that she refused to give Mother Father's address. Furthermore, Stepmother and Father testified that Mother had been at their new residence several times in order to pick up [the Child]. Therefore, the court did not find Mother's testimony to be compelling or credible.

The court does not find Mother's testimony to be credible. The court finds that Mother did not make a diligent effort to continue contact with [the Child] six months prior to the filing of the petition to terminate her parental rights. Mother could have contacted Father on his cell phone number requesting to see her Child. Mother could have submitted to a hair follicle test in order to see her son. Mother could have gone to Father's residence requesting to see her son. Mother could have mailed letters and presents to [the Child] to Father's address. Instead, Mother alleges that she relied on social media to contact Father, yet Father claimed that he never received her messages. Mother could have filed a

petition for contempt in court claiming that Father would not let her see [the Child].

The second line of inquiry is the post-abandonment contact between parent and child. Father testified that the last time Mother saw the Child was in August 2019. Therefore, it has been over one year from the date of filing the petition to terminate Mother's parental rights since Mother had seen the Child. Thus, there is credible and uncontradicted testimony given by Father and Stepmother that there has been minimal post-abandonment contact between Mother and [the Child], and that Mother did not have sufficient contact with the Child for well beyond the requisite six (6) months prior to the filing of the petition for involuntary termination of parental rights.

The third line of inquiry, . . . requires the court to review the evidence in support of termination . . . Section 2511 (b). The court must determine whether the termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child. Intangibles such as love, comfort, security and stability are involved in the inquiry into the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect of permanently severing that bond on the child.

The court finds that the Child's physical needs, developmental needs and emotional needs are met by the Petitioners, Father and [Stepmother].

Orphans' Ct. Op. at 10, 15-18.

Following our review, we find no abuse of discretion or error of law in the orphans' court's conclusion that there was clear and convincing evidence to support termination of Mother's parental rights under Section 2511(a)(1). *See S.P.*, 47 A.3d at 826-27; *see also R.N.J.*, 985 A.2d at 276.

The record reflects that Mother had partial physical custody of the Child pursuant to a February 2019 custody order. *See* N.T. Termination Hr'g at 10-11. Under that order, Mother's paramour was not permitted to have contact

with the Child, and the custody court subsequently ordered Mother to submit to a hair follicle drug test. *See id.* at 11. Mother did not submit to the hair follicle drug test and allowed her paramour to have contact with the Child. *See id.* at 11, 14, 22. As a result, in August of 2019, Father informed Mother that she could no longer have partial physical custody of the Child, and that if she wanted to see the Child, she should file a contempt petition against Father. *See id.* at 14, 87-88. Mother did not file any petitions for contempt or to modify the custody order. *See id.* at 14-15, 48-49. Further, Mother has not seen the Child since August of 2019, more than six months prior to the filing of the instant petition. *See id.* at 12-13, 16, 21.

With respect to Mother's explanation for her conduct, Mother testified that she only sought to contact Father through social media to see the Child because she had lost Father's cell phone number. *See id.* at 40-46, 59, 66. Mother stated that Petitioners told her that if she came to their home, Petitioners would call the police and have Mother arrested. *See id.* at 50-51. However, the orphans' court found Mother's testimony not credible. *See* Orphans' Ct. Op. at 16; *see also* N.T. Termination Hr'g at 40-46, 50-51, 60. Additionally, the orphans' court noted that although Mother testified that she did not have the financial resources to hire an attorney, she also admitted that an attorney from North Penn Legal Aid represented her at the custody proceedings free of charge. *See* Orphans' Ct. Op. at 12; *see also* N.T. Termination Hr'g at 48-49, 53-57.

With respect to Mother's post-abandonment contact with the Child, the record reflects that Mother did not have any contact with the Child, and Mother did not send the Child cards or presents since August of 2019. *See* N.T. Termination Hr'g at 16, 18, 113, 122-23. As stated above, the orphans' court did not credit Mother's explanations for her failure to contact Father about the Child. *See* Orphans' Ct. Op. at 16. Further, the orphans' court rejected Mother's claim that she did not send gifts to the Child because she did not have Father's home address. *See id.*; *see also* N.T. Termination Hr'g at 50-51, 59-60, 122-23.

The record supports the orphans' court's findings. *See id.* at 826-27. Unlike the court in *J.G.J. Jr.*, here the orphans' court found that Mother's testimony was not credible. *Cf. J.G.J. Jr.*, 532 A.2d at 1220, 1222-23. Because the orphans' court's credibility determinations are supported by the record, we decline to reweigh the evidence or to interfere with those credibility determinations. *See S.P.*, 47 A.3d at 826-27. Therefore, we discern no abuse of discretion or legal error by the orphans' court in concluding that Mother failed to perform her parental duties pursuant to 23 Pa.C.S. § 2511(a)(1). *See Charles E.D.M., II*, 708 A.2d at 91; *see also B., N.M.*, 856 A.2d at 855.

### Section 2511(b)

Mother also argues that the orphans' court erred in concluding that termination was in the Child's best interests. Mother's Brief at 12-18. Mother notes that both she and Father testified that she had a good relationship with the Child before Petitioners ended all contact between Mother and the Child.

*Id.* at 14. Mother asserts that while she may have been irresponsible or immature at times, that is not a basis to permanently sever the bond between her and the Child. *Id.* at 14-15. Mother claims that she is willing to work with Father and Stepmother to be a part of Child's life and that this would be a benefit to the Child. *Id.* at 16-17.

Additionally, Mother argues that Petitioners' actions should be viewed with great scrutiny because Petitioners severed contact between Mother and the Child, restricted the Child from seeing other maternal relatives, and Stepmother sent a hostile message to Mother through social media. *Id.* at 15-17. Petitioners testified that the Child does not ask about Mother or his sibling, Mother's other child. Mother claims that this testimony was not credible. *Id.* at 16. Mother acknowledges that the Child did not mention Mother during his interview with the GAL, but notes that the interview occurred after Petitioners "had cut[ ]off contact between [the Child] and Mother for a significant period of time." *Id.*

Petitioners respond that the orphans' court correctly concluded that Petitioners meet all of the Child's physical, developmental and emotional needs, while Mother has not. Petitioners' Brief at 14-15. Petitioners also note that the GAL argued that it was in the Child's best interest that Stepmother adopts the Child. *Id.* at 15.

Section 2511(b) provides:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

- 20 -

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." *C.L.G.*, 956 A.2d at 1008 (citation omitted).

The *C.L.G.* Court explained that regarding Section 2511(b):

Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

Moreover, [t]he court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*Id.* at 1009-10 (citations omitted and formatting altered).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Further, the *K.Z.S.* Court has explained that the existence of "some bond" between a parent and a child "does not necessarily defeat termination of her parental rights." *Id.* at 764. Rather, the question is whether the bond between the

- 21 -

parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. ***Id.***

Further, "Section 2511(b) does not require a formal bonding evaluation." ***Z.P.***, 994 A.2d at 1121 (citations omitted).

Instantly, the orphans' court addressed Section 2511(b) as follows:

The court finds that the Child's physical needs, developmental needs and emotional needs are met by the petitioners, Father and [Stepmother].

\* \* \*

Once the court has found that involuntary termination of parental rights is warranted under the [Adoption] Act, the court must then give primary consideration to the developmental, physical and emotional needs and welfare of the child. This is to be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again.

The court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the court applies the same reasoning for concluding that these needs will be served by the termination of Mother's parental rights.

Finally, the court notes that the [GAL] for the Child recommended that it is in the Child's best interest to terminate the parental rights of Mother to [the Child].

\* \* \*

The court finds that Mother is not and has not been able to meet the Child's needs. In stark contrast, Father and [Stepmother] have amply demonstrated that they continue to meet the Child's physical, developmental and emotional needs and that [the Child] has thrived under their care. The court also found Mother not to be credible as to her reasons for the lack of contact between her and her son. [The Child] needs and deserves a maternal figure in life that will supply proper nurturing, love, guidance and security.

> Termination of the parental rights of the Mother is supported by clear and convincing evidence.

Orphans' Ct. Op. at 18, 21-22 (citations and header omitted and formatting altered).

Based on our review of the record, we discern no basis to disturb the orphans' court's finding that termination of Mother's parental rights would best serve the Child's needs and welfare. *See C.L.G.*, 956 A.2d at 1009-10.

As noted by the orphans' court, Father testified that the Child did not ask about Mother after she stopped seeing the Child in August 2019. *See* N.T. Termination Hr'g at 98. Father also explained that since the Child stopped seeing his Mother, he has not shown any difficulties from the separation. *See id.* at 95. Father explained that the Child loves Stepmother and that the Child "has taken to her very well". *See id.* at 94-95. Additionally, Father stated that his youngest stepdaughter and the Child are "attached to the hip". *See id.* at 94-95. Father believes it is in the Child's best interest for Stepmother to adopt him. *See id.* at 95, 103.

Stepmother testified that when the Child stopped seeing his Mother, she did not notice any problems or issues with the Child. *See id.* at 104-105. She explained that the only time the Child mentioned Mother was when he drew a picture of Mother and her paramour and explained that they had been mean to him. *See id.* at 110. Stepmother testified that she has a very strong relationship with the Child, that they do everything as a family, and that the Child loves being with her two daughters, *i.e.*, his stepsisters. *See id.* at 104.

Stepmother takes cares of the Child's needs and she homeschools him along with her daughters. *See id.* 106-07. Stepmother states she has a strong bond with the Child, she has been acting as a mother for the Child for the last few years, and that she wants to adopt him. *See id.* at 109. Stepmother testified that if she is permitted to adopt the Child, she would treat him as her naturally born son. *See id.*

Further, the GAL stated that she met with Mother, Father, Stepmother, and Child. *See id.* at 135. GAL explained that the Child "was a little bit tough to interview." *See id.* at 137. According to the GAL, the Child recalled Mother's paramour as "being mean". *See id.* The GAL observed that the Child gets along with his stepsisters and "feels that his father and stepmother, and stepsisters and him make up a good family. He enjoys it there." *See id.* (formatting altered). The Child did not ask about Mother at all. *See id.* The GAL concluded that Petitioners met their burden under Section 2511(a)(1) and that "it's in the best interest [of the Child] to be adopted by [Stepmother]." *See id.*

Based on the foregoing, we conclude that the record supports the orphans' court's conclusions that there was no bond between the Child and Mother, and that Stepmother is fulfilling a parental role for the Child. Likewise, the record supports the orphans' court's determination that the termination of Mother's parental rights served the best interests of the Child. *See C.L.G.*, 956 A.2d at 1009-10. Further, to the extent that Mother argues that Petitioners' testimony is not credible, we decline to reweigh the evidence or

interfere with the orphans' court's credibility determinations which are supported by the record. ***See S.P.***, 47 A.3d at 826-27.

In sum, we conclude that the orphans' court did not abuse its discretion in terminating Mother's parental rights to the Child. ***See id.*** Accordingly, we affirm.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/09/2022