J-S11001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.G.C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.H., MOTHER | : : : : : : : | |
| | : | No. 1 EDA 2023 |

Appeal from the Decree Entered November 16, 2022
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  36 OCA 2021

BEFORE:  OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 07, 2023**

K.H. ("Mother") appeals from the November 16, 2022 decree, in the Monroe County Court of Common Pleas, granting the petition of P.C. ("Father") and A.C. ("Stepmother"), involuntarily terminating her parental rights to her twelve-year-old daughter, C.C. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).  After careful review, we affirm.

In the opinion accompanying the decree, the orphans' court set forth 56 factual findings, which the evidence supports.  *See* Orphans' Court Opinion, 11/16/2022, at 2-9.  Therefore, we adopt those findings herein.  Child was born in February 2011.  *See* N.T., 8/18/2022, at 5.  For approximately three years thereafter, Father and Mother lived together with Child.  Upon separation, they shared physical and legal custody of Child.  *Id.* at 7.

Thereafter, numerous arrests led to Mother's incarceration. In April 2013, she was arrested and charged with driving while under the influence ("DUI") and endangering the welfare of children because Child was present at the time of the incident. *See* N.T., 8/18/2022, at 7-8; Father's Exhibit A. Approximately one year later, Mother was arrested for retail theft, and then again in November 2014 for recklessly endangering another person ("REAP"), disorderly conduct, and public drunkenness.[1] *Id.* Ultimately, she was incarcerated in November 2014, and Father obtained sole legal and physical custody of Child. *See* N.T., 8/18/2022, at 7-8.

Mother was released around September 2016. *See* N.T., 8/18/2022, at 8; N.T., 10/21/2022, at 79. Once released, Mother filed a petition to modify custody and by interim order dated August 29, 2016, she was awarded supervised partial physical custody once a week for a period not less than two hours. *See* Custody Order, 8/29/2016. After various conciliation conferences and orders, the court conducted an evidentiary hearing on January 19, 2018. The court awarded Mother, *inter alia*, shared legal custody and partial physical custody of Child on the weekends. *See* Custody Order, 1/19/2018.

This arrangement was short-lived as Mother was arrested in July 2018 for retail theft, and subsequently missed a conciliation conference. *See* Father's Exhibit A. On September 4, 2018, the court adopted the interim order

_____

[1] Mother was charged with REAP because, again, Child was present in the vehicle when Mother was arrested. *See* Father's Exhibit A.

of August 27, 2018, awarding Father sole legal and physical custody. Thereafter, Mother did not attempt to alter custody until she filed a petition to modify on September 24, 2021, approximately three months after Father and Stepmother filed their petition to involuntarily terminate her parental rights to Child.[2] *See* N.T., 8/18/2022, at 12, 34, 80.

Following the August 2018 interim custody order, Mother was arrested two more times. In January 2019, Mother was arrested and charged with theft by unlawful taking, and in June 2020, she was charged with retail theft. *See* N.T., 8/18/2022, at 25-26; N.T., 10/21/2022, at 78. Following her June 2020 arrest, Mother began an outpatient methadone program at Miners Medical Center.[3] *See* Mother's Exhibit 8.

On June 22, 2021, Father and Stepmother filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A.

---

[2] Father and Stepmother have lived together since 2015, married in 2017, and Stepmother testified that she has performed parental duties for Child since 2014. N.T., 8/18/2022, at 4-5, 94.

[3] Mother's methadone program records indicate that during the six months preceding Father's and Stepmother's involuntary termination petition, Mother tested positive for a variety of substances including cocaine and fentanyl. Mother's Exhibit 8.

§ 2511(a)(1) and (b) ("TPR petition") and a petition for adoption.[4, 5]  The

orphans' court conducted hearings on August 18, 2022, and October 21, 2022.

Mother was represented by counsel and testified on her own behalf.  She also

presented the testimony of P.B., maternal grandfather, and E.P., maternal

grandmother's paramour.[6]   Father and Stepmother testified on their own

behalf, and additionally presented the testimony of Sara J. Cornell. Psy.D.,

Child's psychologist.  Child, who was eleven years old at the time, was

represented by legal counsel.[7]  The court conducted an *in camera* interview of

Child in the presence of all counsel wherein she testified that she desires to

be adopted by Stepmother.  ***See*** N.T., 8/18/2022, at 100.

---

[4] Father and Stepmother filed an amended petition on December 21, 2021 that included 23 Pa.C.S.A. § 2511(a)(2) as an additional ground for the termination of Mother's parental rights.

[5] At the request of the parties, the termination hearing was continued various times.  ***See*** Orphans' Court Opinion, 11/16/2022, at 1.  In the interim, the parties participated in a custody conciliation on December 20, 2021, at which time, by interim order, Father retained sole legal and physical custody of Child. ***See*** Custody Order, 12/20/2021.  On February 24, 2022, the interim order was adopted by the court.  ***See*** Order, 2/24/2022.

[6] B.S. ("maternal grandmother"), with permission from Father, visited with Child until just before she passed away in May 2021.

[7] Although the transcripts of testimony list Victoria Strunk, Esquire, as the guardian *ad litem* for Child, in its order appointing Attorney Strunk, the trial court specified that she is "legal counsel."  At the conclusion of the hearing on October 21, 2022, Attorney Strunk confirmed that Child's position had not changed; Child does not want to see or speak with Mother.  N.T., 10/21/2022, at 131.  Attorney Strunk did not file a brief in response to Mother's appeal.

On November 16, 2022, the orphans' court issued a decree involuntarily terminating Mother's parental rights, as well as a contemporaneous opinion. Thereafter, on December 15, 2022, Mother, through appointed counsel, filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On December 16, 2022, the orphans' court filed a statement pursuant to Rule 1925(a), referring this Court to its memorandum opinion accompanying the decree.

On appeal, Mother presents the following issue for review:

1. Whether the court erred in finding that petitioner proved the elements of 23 Pa.C.S.A. § 2511(a)(1), [(2), and (b)] by clear and convincing evidence?

Mother's Brief at 4 (unnecessary capitalization and suggested answer omitted).

We review involuntary termination orders for an abuse of discretion which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K*, 265 A.3d 580, 591 (Pa. 2021).

- 5 -

An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act. If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, then the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).[8] We have long held that,

_____

[8] Section 2511(a)(2) is not applicable despite the orphans' court's discussion of the subsection in its memorandum accompanying the termination decree.

Significantly, to terminate parental rights pursuant to Section 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

No evidence suggests that Child has been without essential parental care, control, or subsistence while in the care of Father and Stepmother. *See In re Adoption of L.A.K*, 265 A.3d at 600 (finding termination of the father's parental rights under Section 2511(a)(2) was not appropriate where no evidence was presented that children, while in the care of the mother and stepfather, were without essential parental care, control, or subsistence). Accordingly, the record does not support termination of Mother's parental rights pursuant to Section 2511(a)(2).

- 6 -

in order to affirm a decree terminating parental rights, we need only agree

with the trial court as to any one subsection of Section 2511(a), as well as

Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

As such, we analyze the court's termination decree pursuant to Section

2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

As we have explained, this Court reviews a sufficiency challenge to a

Section 2511(a)(1) termination in the following manner:

> To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the

termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

This Court has instructed, "[I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case." *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999) (citations omitted). This requires the court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

Further,

- 8 -

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super 2008) (*en banc*).

Regarding the definition of "parental duties," this Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while

others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (citations omitted).

Mother argues that Father did not present clear and convincing evidence of Section 2511(a)(1) and (b). Regarding Section 2511(a)(1), Mother baldly asserts that Father prevented Mother from seeing Child. Mother's Brief at 15; (*citing* *In re J.G.J., Jr.*, 532 A.2d 1218 (Pa. Super. 1987) (affirming the trial court's decree denying the father's petition to involuntarily terminate the mother's parental rights where father expressly prohibited the mother from physically visiting with the child)). Mother further contends that Child believes Father would be angry if she told Father she wanted to see her. *See* Mother's Brief at 15.

Mother's argument is without merit. Primarily, our review did not reveal, and Mother has not cited to, any evidence indicating that Father prevented Mother from seeing or contacting Child. It is true that Father blocked Mother's cell phone number after he received harassing communications from her, including text messages in the early hours of the morning. *See* N.T., 8/18/2022, at 50-51, 65. While Father blocked Mother's cell phone number after he received harassing communications from her, the record establishes that Mother had many ways of communicating with him. *Id.* at 50-51, 75-76. Father further testified on cross-examination that whether Child wants to talk to Mother is up to her:

- 10 -

Q: [] Okay. If [Child] wanted to contact [Mother] or [Mother] wanted to call and talk to [Child], would you allow it?

A: Would I allow it? It's not my business to disallow it or not allow it. It's her mother. So it's entirely up to [Child], what [Child] wants to do.

*Id.* at 55. Child also testified that Father has asked her about contacting Mother. Child explained:

Q: Did you ever ask for [Mother's telephone number], from [Father]?

A: No. But he's asked me like, do you want to call her? Like, I can give you the phone number. And I'm like no I don't want it . . . .

N.T., 8/18/2022, at 116. Accordingly, Mother's argument that Father prevented Mother from seeing Child is without merit.

Mother also argues that she was focused on maintaining her sobriety before filing a petition to modify custody. *Id.* at 17 (*citing* **L.A.K.**, 265 A.3d at 580) (reinstating the trial court's decree denying the petition to involuntarily terminate the father's parental rights where the father distanced himself from the children until he could achieve sobriety)). Mother contends that she has been in treatment for years. *See* Mother's Brief at 17. Mother argues that the orphans' court should have considered the barrier of Mother's addiction and her desire to be sober and stable prior to reestablishing her parental duties. *Id.* She also argues that she maintained contact with Child *via* Facetime, telephone conversations, and by sending cards and gifts.

Mother concludes that "[s]he did everything she could short of filing for a modification but provided a reasonable explanation for not doing so." *Id.*

In its opinion accompanying the decree, the orphans' court determined that Mother failed to perform parental duties for a period of at least six months prior to the filing of Father's and Stepmother's petition and, "[i]n fact, Mother had periods in which she failed to perform parental duties dating back to 2013 when she was arrested and eventually incarcerated for DUI and endangering the welfare of [Child]." Trial Court Opinion, 11/16/2022, at 13. The court emphasized that "Mother's explanation of why she did not file for custody between 2018 and September 2021, which was after the [involuntary termination] petition was filed, was unconvincing." *Id.* at 15.

The court continued, as follows:

In a rather candid moment, Mother also testified that her drug use led to a period of time she was unavailable as a parent. Unfortunately, this occurred from her 2013 arrest through September 2016, and again at some point in 2018 nearly through to the filing of the TPR petition in June 2021. Mother spent time in jail in 2018 for an arrest after a relapse. She admitted she slipped again in her use when charged with retail theft in June 2020 and October 2020. While Mother's drug use may explain her being unavailable at times, it caused long absences from [Child's] life. These absences continued even when Mother was supposedly sober from October 2020 through June 2021 when the TPR petition was filed. The explanation provides insight to Mother's issues with drug addiction and the consequences thereof. But, it is an insufficient excuse for the lengthy period of time that Mother failed to be available as a parent to [Child].

Mother's other explanation for her absence was that she did not want to infringe upon maternal grandmother's visits with [Child]. Mother believed that if she filed for custody after 2018, maternal grandmother would somehow lose her ample visitation that Father

- 12 -

allowed with [Child].  That visitation was not court-ordered.  But, somehow Mother believes Father would have stopped those visits, apparently out of spite for Mother.  We saw no evidence that would have occurred.  Mother also offered the alternative explanation that if she filed for custody, she would have upset maternal grandmother.  Mother claims she had considered filing for custody about the time maternal grandmother died in May 2021, which is why she ultimately waited until September 2021.  We find Mother's explanation lacking in credibility, and is simply not supported by any other evidence.  It appears more likely that Mother simply relied on maternal grandmother to provide Mother with phone/FaceTime contact while she battled her drug addiction, and only filed for custody when she realized Father and Stepmother were moving ahead with TPR and adoption.

*Id.* at 16-17.  The court concluded that "Mother's contacts and efforts between the September 2018 custody order awarding sole legal and physical custody to Father and September 2021, when Mother filed for custody (after the TPR petition was filed) were minimal to non-existent.  As a result, the petitioners [] presented clear and convincing evidence of grounds for termination of Mother's parental rights under Section 2511(a)(1)." *Id.* at 17.

We discern no abuse of discretion.  Father testified that from September 2018 to September 2021, Mother failed to perform any parental duties.  *Id.* at 16-17.  He stated that Mother sent some letters, but "there were a few that . . . were inappropriate for [Child] to read[,]" including a story about "wicked stepparents."  *Id.* at 17; *see also* Father's Exhibit I.  He also stated that Mother sent gifts and Child "received the gifts and then said donate them or throw them away."  N.T., 8/18/2022, at 54.  Father further testified that Mother only requested information on Child's medical history in 2016, and last attended a doctor's appointment for Child in 2012 or 2013.  *Id.* at 66, 88-89.

- 13 -

He also asserted that Mother never attended any of Child's school functions (*e.g.*, parent teacher conferences, musical performances, etc.). *Id.* at 91.

Mother testified on direct examination that the only contact she had with Child from when Father was awarded sole legal and physical custody in September 2018, to when Father and Stepmother filed the termination petition in June 2021, was through maternal grandmother. She testified:

> Q: Okay. So starting in 2018, what efforts did you make to maintain a relationship with [Child]?
>
> A: Well, every single time my mom would get to visit her, which would at least, I think, be monthly, she would, you know say, [Child's] in the car, call. And then [Child] would just answer. So anytime my mother had her, we talked probably two to three times a day.

N.T., 10/21/2022, at 85-86. Mother also confirmed that she only received updates about Child through maternal grandmother and last had contact with Child before maternal grandmother passed away in May 2021. *Id.* at 86-87, 128. Moreover, Mother failed to file a petition to modify custody until three months after Father and Stepmother filed their petition to involuntarily terminate Mother's parental rights.

Child confirmed during the *in camera* interview that she received gifts and cards from Mother, but stated that she "didn't really need cards. So I just [] threw them away." N.T., 8/18/2022, at 112. Child also testified that the gifts were not age appropriate: "[] the toys that she gives me are [] for three[-]year[-]olds." *Id.* Child also testified regarding her conversations with Mother *via* FaceTime, as follows:

- 14 -

Q: When you said that you sometimes had to answer the phone if [Mother] was calling?

A: Um-hmm.

Q: What would [maternal grandmother] say or do that made you answer the phone?

A: She'd be like come on it's [Mother], answer it.  Just answer it. Answer it and I didn't -- and I just didn't want her to start yelling because I am not a fan [of] being yelled at.

Q: [] So [maternal grandmother] would, if . . . you didn't answer the phone and talk to [Mother] for a minute or two, [maternal grandmother] would get upset?

A: Probably.  I just -- never actually saw what she would do.  I would just answer the phone.

. . .

Q: Did you want to talk to [Mother]?

A: No.  I never did.

*Id.* at 106-107.

Mother provided two explanations for her failure to perform parental duties: (1) maintaining her sobriety, and (2) to appease the maternal grandmother who was concerned that Father would prevent her from seeing Child if Mother filed a petition to modify custody.  Mother argues that her situation is analogous to the parent in *L.A.K.*, *supra*.  In that case, the trial court denied the petition to terminate and recognized that a parent's addiction to alcohol was a barrier to reuniting with his children.  *Id.* at 583.  The trial court determined that the parent stayed away from his children to achieve sobriety which was in the children's best interest, and had filed a petition to

modify custody prior to the filing of the petition to involuntarily terminate his parental rights. *Id.* at 584, 586. This Court reversed and concluded that the trial court abused its discretion in denying the termination petition. *Id.* at 588-589. Thereafter, our Supreme Court reversed this Court's determination and remanded with instructions to reinstate the order of the trial court. *Id.* at 601. In so doing, the *L.A.K.* Court determined that "alcohol addiction can present a barrier to fulfilling parental obligations and as such, the determination of whether efforts to overcome the barrier are sufficient to overcome a finding of parental abandonment under Section 2511(a)(1) of the Adoption Act is a fact-specific determination that rests within the discretion of the trial court." *Id.* at 583.

In the instant matter, the orphans' court determined that "Mother's issues with drug addiction and the consequences thereof" are "an insufficient excuse for the lengthy period of time that Mother failed to be available as a parent to [Child]." Orphans' Court Opinion, 11/16/2022, at 16. Additionally, contrary to the father in *L.A.K.* who filed a petition to modify custody prior to the termination petition, Mother did not file her petition until three months after the instant petition was filed.

Moreover, unlike the father in *L.A.K.*, on cross-examination, Mother proffered a second reason for her failure to perform her parental duties, as follows.

Q: So your attorney was in contact with you and then, correct me if I'm wrong, your testimony was that from that point, 2018, when

- 16 -

you knew you didn't have any more custody rights under the order, you didn't file because you were working on --

A: I was working on like my sobriety and myself, and I just knew I couldn't be the best like me that I could be.

Q: Okay. So in your opinion does a parent have to have every box checked and have everything perfect in order to be of value to their child?

A: No.  Honestly it was really a lot of my mom begging me not to, like begging me to wait, wait for more time, get more time under your belt, 'cause she just thought once I filed papers that she wasn't gonna be able to see [Child].

Q: Did your mom ever file anything to assert grandparents' rights with you?

A: No.  She wanted to and she said she was afraid if she lost, then [Father] would never let her see [Child].  So she just said, I'll just take what I can get.

Q: So she had no rights under a court order to see [Child]?

A: No, ma'am.

Q: And she was seeing her regularly?

A: Yes, ma'am.

Q: And that was with [Father's] permission?

A: Yes

. . .

Q: Was there any other reason than your mother telling you not to file, that you did not come to the court and file for some rights to see your daughter?

A: No.  She just kept saying, you're -- you're going to ruin it, I'm not gonna be able to see her, I'm not gonna be able to see her, [Father] -- [Father] won't let me see her any more if you do this, just wait a little longer, wait a little longer.

N.T., 10/21/2022, at 120-124.  Aside from this testimony, the record contains no corroborating evidence that Father would have stopped visits between Child and maternal grandmother and the orphans' court did not find Mother's explanation credible.  ***See*** Orphan's Court Opinion, 11/16/2022, at 16.

Based upon our review of the foregoing evidence, we find that the orphans' court did not abuse its discretion.  It is undisputed that Mother failed to perform her parental duties to Child well beyond the crucial six-month period.  ***See In re D.J.S.***, 737 A.2d at 286.  Moreover, Mother did not file a petition to modify the existing custody order until three months after Father and Stepmother filed their petition to involuntarily terminate her parental rights to Child.  By her own admission, Mother chose to wait to file for custody of Child at the behest of maternal grandmother and relied upon her for what minimal contact she had with Child.  ***See In re B., N.M.***, 856 A.2d at 855 (finding that "parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs"); ***see also In re Z.P.***, 994 A.2d 1108, 1119 (Pa. Super. 2010) (finding post-abandonment contact must be steady, consistent, and contribute to the psychological health of the child).  Accordingly, as we discern no error of law or abuse of discretion, we will not disturb the orphans' court's finding of grounds for termination pursuant to Section 2511(a)(1).

We next must determine whether termination was proper under Section 2511(b). Our Supreme Court has outlined this inquiry as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

Moreover:

> While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (*quoting*

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and

citations omitted).

Mother contends that the testimony from Child's psychologist, Dr.

Cornell, was inconsistent and biased against her. Mother's Brief at 24. She

contends that Dr. Cornell was not aware that "[C]hild thought [F]ather would

be upset if she told him she wanted to see [M]other." ***Id.*** Mother concludes

that an unbiased party should review whether severing Child's bond with her

is in her best interest pursuant to Section 2511(b). ***Id.***

In determining that Father provided clear and convincing evidence

pursuant to Section 2511(b), the orphans' court stated the following in its

opinion accompanying the decree:

> In this case, [Child] is bonded to Stepmother and wants to be
> adopted by her. Stepmother wants to adopt [Child]. Stepmother
> has been in [Child's] life for over five years. [Child] is now
> [eleven], so she has known Stepmother for half of her life. [Child]
> has expressed clearly to the court, to [Father], and to Dr. Cornell,
> that she does not want to see Mother anymore. Dr. Cornell
> recommends that [Child] not visit or reunite with [] Mother for her
> emotional, physical and mental well-being. [Child] has no bond
> with Mother. It is unlikely this will change. Father has been
> supportive of [Child's] feelings of what she wishes to have happen.
> [Child] is old enough and aware enough of things to express her
> own feelings and opinions on this subject.
>
> Mother believes [Child] is lying, or at least being coerced into
> saying that she wants to be adopted. Mother states that what
> [Child] is saying now is not what she said to Mother in the past.
> Mother believes Dr. Cornell is lying and would say whatever she
> is paid for by Father. Mother believes Father is lying. Mother said
> she is the only one not lying in this matter. We do not agree with

> Mother's perception of this issue as there is no evidence to support it.

Trial Court Opinion, 11/16/2022, at 19. The trial court also found Child, Father, Stepmother, and Dr. Cornell credible regarding Child's desire to be adopted by Stepmother and no longer see or speak to Mother. *Id.* at 20.

The orphans' court's determinations are supported by the record. Primarily, as related *supra*, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d at 1123. The orphans' court determined that Child "has no bond with Mother." Orphans' Court Opinion, 11/16/2022, at 19. During the *in camera* interview, on inquiry by Father's attorney, Child stated as follows regarding whether she wants to see Mother again.

> Q: So you don't think there's anything in the whole wide world [Mother] could do that would make it, where you would want to see her again?
>
> A: Nothing.
>
> Q: Absolutely nothing?
>
> A: No.
>
> Q: You thought about this?
>
> A: Um-hmm.

N.T., 8/18/2022, at 109. Additionally, as stated above, although Child spoke with Mother on the telephone or *via* Facetime during times with maternal

grandmother, she only acquiesced because she did not want maternal grandmother to yell at her. *Id.* at 106-17.

Dr. Cornell, Child's psychologist since 2017, testified that Child often stated that she does not want to see Mother. N.T., 10/21/2022, at 13, 19. Dr. Cornell also performed an evaluation of Mother, after Father and Stepmother filed their petition to involuntarily terminate her parental rights. *Id.* at 19. In her report following the evaluation, Dr. Cornell concluded that it was not healthy for Child to have a relationship with Mother and that there is no bond between them. *Id.* at 22; *see also* Father's Exhibit L. Contrary to Mother's bald assertion, this Court found no evidence in the record to support her assertion that Dr. Cornell was biased against Mother.

Stepmother and Child, on the other hand, have a parent-child bond. As related *supra*, Stepmother has performed parental duties for Child since 2014. N.T., 8/18/2022, at 94. Stepmother also testified that she loves Child, and that she believes Child loves her. *Id.* at 95. Child confirmed that she wants to be adopted by Stepmother and that they have a good relationship. *Id* at 100-101. Therefore, we discern no error of law or abuse of discretion in the court's finding that termination of Mother's parental rights would best serve Child's needs and welfare pursuant to Section 2511(b).

Based on the foregoing, we affirm the decree involuntarily terminating Mother's parental rights.

Decree affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

*Date: 6/7/2023*